UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION
KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 12-107-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| MICHAEL R. WALLI, MEGAN RICE, | ) | **ORDER** |
| and GREG BOERTJE-OBED, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

To truly understand a person, the saying goes, you have to walk a mile in his shoes. In this case, the distance required is closer to half a mile. The defendants—Michael Walli, Megan Rice, and Greg Boertje-Obed—believe that the production, possession, and deployment of nuclear weapons violates international law. By their own admission, the defendants entered the Y-12 National Security complex, which produces and stores enriched uranium and other nuclear weapon components. R. 49 at 6−7. They walked through the complex for about two hours until they reached the Highly Enriched Uranium Materials Nuclear Facility ("HEUMNF"). They "splashed human blood on the building," "hammered on the wall," "stretched crime scene tape across the area," "spray painted words on the walls," and "hung two banners" that said "Transform Now Plowshares" and "Swords Into Plowshares Spears Into Pruning Hooks–Isaiah." *Id.* at 7. After a guard spotted them, they read him a statement explaining their position on nuclear weapons, offered him bread, and began to sing. *Id.* at 8. Extreme measures, some may say. But the defendants view their actions as a legitimate, even obligatory, response to the threat posed by nuclear weapons.

The defendants were initially charged in a three-count indictment, and a superseding indictment later replaced one of the initial counts with a more serious charge. The first indictment charged the defendants with: (1) willful destruction or injury of property within the special maritime and territorial jurisdiction of the United States, 18 U.S.C. § 1363; (2) willful injury of or depredation against property of the United States in excess of $1,000, 18 U.S.C. § 1361; and (3) misdemeanor trespass on the property of the United States Department of Energy, 42 U.S.C. § 2278a(c). *See* R. 2. The superseding indictment substituted the trespass count with what the parties describe as a "sabotage" count. *See* R. 55 (count one); 18 U.S.C. § 2155(a) (willful injury of national defense premises with intent to harm the national defense). In doing so, the superseding indictment raised the maximum term of imprisonment that the defendants face from a one-year term of imprisonment to a twenty-year term of imprisonment. *Compare* 42 U.S.C. § 2278a(c), *with* 18 U.S.C. § 2155(a).

The defendants filed a series of motions relating to the superseding indictment, including two motions to dismiss, a motion for a bill of particulars, and three motions for discovery. The United States filed a motion to preclude the defendants from presenting certain defenses to the jury.

These motions were referred to the Magistrate Judge, who issued two reports and recommendations and a memorandum opinion and order. The Court allowed the parties to file objections to the memorandum opinion and order. *See* R. 97 at 1. The Court also granted the defendants' request to present evidence on their objections to the two reports and recommendations and the memorandum opinion and order. *See id.* at 1–2. The defendants

called one witness, former United States Attorney General Ramsey Clark. *See* R. 103; R. 121. The defendants submitted additional evidence through affidavits, meaning that evidence was not subject to cross-examination by the government. *See* R. 103; R. 104-1; R. 105-1; R. 106-1; R. 121. This opinion references Attorney General Clark's testimony and the affidavits where that evidence is relevant.

## DISCUSSION

A district court reviews the objected-to portions of a report and recommendation de novo. *See United States v. Raddatz*, 447 U.S. 667, 681–82 (1980). This Court will also review the objected-to portions of the memorandum opinion and order de novo.

## I. Motion To Dismiss Count One of the Superseding Indictment

The defendants argue that count one of the superseding indictment—willful injury of national-defense premises with intent to harm the national defense in violation of 18 U.S.C. § 2155(a)—must be dismissed for three reasons. First, the prosecutors obtained a superseding indictment with the section 2155(a) charge to punish the defendants for exercising their Sixth Amendment right to a trial. Second, section 2155(a) is unconstitutionally vague. Finally, the prosecution cannot meet its burden to prove that the Y-12 complex falls within the definition of a "national-defense premises." *See* R. 71 at 1.

### a. Vindictive and Selective Prosecution

The defendants argue that count one must be dismissed because it is the result of both vindictive and selective prosecution. They allege that after the prosecution obtained the initial indictment, the prosecution "threatened to charge [them] with a more serious crime [under section 2155(a)] if they refused to plead guilty." R. 72 at 3. When the defendants did

not plead guilty, the prosecution fulfilled its promise by obtaining a superseding indictment. *See id.* The defendants argue that the prosecution decided to pursue the section 2155(a) charge in retaliation for their exercise of their Sixth Amendment rights. As such, the defendants argue, the section 2155(a) charge is evidence of vindictive and selective prosecution. They are wrong.

The tests for vindictive prosecution and selective prosecution are slightly different, but those differences are not significant in this case. To prove vindictive prosecution, the defendants must show that (1) the prosecution has a stake in deterring the defendants' exercise of their constitutional rights and (2) that the prosecution's conduct was unreasonable. *See United States v. Moon*, 513 F.3d 527, 535 (6th Cir. 2008) (citations omitted). Selective prosecution is a broader claim that addresses prosecutorial discrimination because of membership in a protected class as well as discrimination the exercise of constitutional rights. *See United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991). However, the defendants do not argue that they were discriminated against because of their membership in a protected class. As a result, the test for selective prosecution is functionally the same as the test for vindictive prosecution in this case. To establish selective prosecution, the defendants must show that the prosecutor singled them out because of their decision to proceed to trial. To do so, they must show that others in their situation were not similarly charged. The defendants must also show that the prosecution's intent was discriminatory and that the prosecution's action had a discriminatory effect on defendants who chose to proceed to trial. *See id.*

*Bordenkircher v. Hayes*, 434 U.S. 357, 357 (1978), forecloses the defendants' vindictive and selective prosecution arguments. *See* R. 85 at 17−18. The common element of vindictive and selective prosecution claims is that the prosecution must have acted unreasonably or done something wrong. *Bordenkircher* held that a prosecutor does not violate a defendant's due process rights where he "openly present[s] the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution." 434 U.S. at 365. The Court explained that plea bargaining is an accepted practice that benefits both the prosecution and the defendant. *See id.* at 362–64. As a result, the "prosecutor's interest at the bargaining table [] to persuade the defendant to forgo his right to plead not guilty" is a "constitutionally legitimate" one. *Id.* at 362–64. Here, as in *Bordenkircher*, the prosecution offered the defendants two alternatives: plead guilty to the original indictment or proceed to trial and face higher charges in a superseding indictment. Under *Bordenkircher* then, the prosecution did nothing wrong, and the defendants cannot make out a claim for selective or vindictive prosecution.

The defendants admit that *Bordenkircher* is fatal to their argument and urge this Court to hold that *Bordenkircher* is bad law and to assess their claim under several pre-*Bordenkircher* cases. *See* R. 725 at 5–6; R. 89 at 6–8. The Supreme Court can overturn Supreme Court precedent, but this Court cannot.

### b. Vagueness

The defendants argue that section 2155(a) is unconstitutionally vague because the statute contains, but does not define, the term "national defense." *See* R. 76 at 4. Section 2155(a) reads as follows:

> Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined under this title or imprisoned not more than 20 years, or both, and, if death results to any person, shall be imprisoned for any term of years or for life.

Section 2151 defines the terms "national-defense material," "national-defense premises," and "national-defense utilities" by reference to the term "national defense." Section 2151 does not define "national defense." The defendants argue that the absence of a definition for the term "national defense" renders the statute unconstitutionally vague. *See* R. 72 at 9–10; R. 89 at 2–4.[1]

A criminal statute that "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" is unconstitutionally vague. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).[2] However, absolute precision is not required, and "one who deliberately goes perilously close to an area of proscribed conduct . . . take[s] the risk that he may cross the line." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952). Where, as here, a criminal statute does not raise First Amendment concerns, the question is whether the statute is vague as applied to the defendant's conduct. Whether the statute might

---

[1] The defendants also raise an overbreadth challenge to section 2155. Their argument appears to be that the statute is literally overly broad, in that the statute could cover a broad range of conduct. *See* R. 76 at 3–6. But the overbreadth doctrine comes into play when there is "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court." *United States v. Hart*, 635 F.3d 850, 857 (6th Cir. 2011) (quoting *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990)). The defendants' motion makes a passing reference to the symbolic nature of their acts. *See* R. 72 at 10. Assuming that sentence is enough to raise an overbreadth challenge, the challenge fails. As explained below, the defendants did not have a First Amendment right to protest inside the Y-12 complex. *See infra* section III.c.

[2] A statute will also be unconstitutionally vague if it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *Morales*, 527 U.S. at 56. The defendants do not argue that section 2155 is unconstitutionally vague on those grounds.

be vague as applied to some other conduct is irrelevant. *See United States v. Kernell*, 667 F.3d 746, 750 (6th Cir.), *cert. denied*, 133 S. Ct. 259 (2012).

A statute does not become unconstitutionally vague simply because a term is undefined. In *Gorin v. United States*, 312 U.S. 19 (1941), the Court dealt with a similar vagueness challenge to the Espionage Act, 18 U.S.C. § 793. That Act also did not define the term "national defense." *See Gorin,* 312 U.S. at 26−27. The Court held that the term "is a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." *Id.* at 28 (internal quotation marks omitted). The term "national defense" was "sufficiently definite to apprise the public of prohibited activities and [] consonant with due process." *Id.* Courts faced with vagueness challenges to section 2155 have looked to *Gorin* for guidance. Each of these courts held that the phrase "national defense" as used in section 2155 has the same meaning as in the Espionage Act. *See, e.g.*, *United States v. Platte*, 401 F.3d 1176, 1180 (10th Cir. 2005); *United States v. Kabat*, 797 F.2d 580, 586 (8th Cir. 1986); *United States v. Melville*, 309 F. Supp. 774, 780 (S.D.N.Y. 1970). This Court agrees.

The defendants have not explained why this "well understood," *Gorin*, 312 U.S. at 28, definition of the term national defense is unconstitutionally vague as applied to their conduct. At various points, the defendants suggest that the government will not be able to prove that their conduct actually violated section 2155. *See* R. 76 at 5 ("[I]t seems safe to predict that in the instant case, there will not be evidence [that the defendants injured the national defense.]"). That is not an argument that the defendants do not know what the statute prohibits; instead, it is an argument that the defendants do not believe the statute prohibits

their conduct. That concern "is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *United States v. Paull*, 551 F.3d 516, 525 (6th Cir. 2009) (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)). At trial, the government will have to prove that the elements of section 2155 have been met.[3] The jury may find it "difficult . . . to determine whether these clear requirements have been met," but that possibility does not render section 2155 unconstitutionally vague. *Williams*, 553 U.S. at 306.

### c. The "National Defense" Element

The defendants argue that they did not violate section 2155(a), because they did not injure "national-defense premises." *See* R. 72 at 10–11; R. 89 at 11–12. Two specific arguments appear to be embedded in this general one. First, the defendants contend that because private contractors run the Y-12 complex, any damage they caused was to private property and not to national-defense premises. *See* R. 72 at 10–11. Second, the defendants argue that this Court should allow them to present evidence at trial that the manufacture and use of nuclear weapons are not "actually part of the national defense." *See* R. 89 at 12.

The indictment charges the defendants with damaging the Y-12 complex, R. 55 at 1, and the Y-12 complex is a national defense premise. Section 2151 defines "national-defense premise" as:

> all buildings, grounds, mines, or other places wherein such
> national-defense material is being produced, manufactured,

---

[3] The defendants' objection appears to argue that the government will be able to obtain a conviction without meeting its burden of proof. *See* R. 89 at 3 ("Prosecutors intend to proceed on the legal fiction that defendants have interfered with national defense but defendants are not entitled to know on the record what that is nor to put on evidence about it."). That is, of course, incorrect. The government will have to meet its burden of proof or the defendants will be entitled to a directed verdict.

> repaired, stored, mined, extracted, distributed, loaded, unloaded, or transported, together with all machinery and appliances therein contained; and all forts, arsenals, navy yards, camps, prisons, or other installations of the Armed Forces of the United States.

Section 2151 defines "national-defense material" as:

> arms, armament, ammunition, livestock, forage, forest products and standing timber, stores of clothing, air, water, food, foodstuffs, fuel, supplies, munitions, and all other articles of whatever description and any part or ingredient thereof, intended for, adapted to, or suitable for the use of the United States in connection with the national defense or for use in or in connection with the producing, manufacturing, repairing, storing, mining, extracting, distributing, loading, unloading, or transporting of any of the materials or other articles hereinbefore mentioned or any part or ingredient thereof.

The defendants argue that the indictment does not allege that they damaged a "national-defense premises," a required element of section 2155(a).[4]  The Y-12 complex is owned by the Department of Energy and run by a private contracting firm.  The defendants interpret national-defense premises as only those properties owned and run by the military.  *See* R. 72 at 10; R. 89 at 12.  The plain text of section 2151 rebuts that argument.  The above definition of national-defense premises includes places where national-defense material is made, stored, or transported *and* military establishments.  *See* 18 U.S.C. § 2151. So the covered premises include more than just properties owned by the military.  Furthermore, the Y-12 National Security complex produces and stores enriched uranium and other nuclear weapon components.  Enriched uranium and other components of nuclear weapons are arguably "articles . . . intended for . . . the use of the United States in connection with the national

---

[4] The defendants might also be claiming that they believed that Y-12 was wholly owned and operated by a private company, meaning they did not have any intent to affect the national defense of the United States. They may raise their intent argument at trial to show that they did not have the intent required to be guilty.  But the argument is a factual, not legal, one and does not demonstrate a deficiency in the indictment.

defense." *See* 18 U.S.C. § 2151. Thus, the indictment is sufficient because it alleges that the defendants harmed the Y-12 complex, which the government is entitled to prove at trial qualifies as a "national-defense premises." 18 U.S.C. § 2155(a); *see also United States v. Coss*, 677 F.3d 278, 288–89 (6th Cir. 2012) (explaining that an indictment must "contain[] the elements of the offense charged" to be sufficient (quotation omitted)).

The defendants also argue that they must be allowed to present evidence that the manufacture, storage, refurbishment, and use of nuclear weapons is not actually part of the national defense. *See* R. 89 at 12. Nothing in the Magistrate Judge's report and recommendation relieves the prosecution of its burden to prove each element of the section 2155(a) charge beyond a reasonable doubt. And nothing in the report and recommendation bars the defendants from arguing that the prosecution has not met that burden.[5] So the defendants' objection does not call the report and recommendation into question.

## II.    Motion To Dismiss Counts One, Two, and Three of the Superseding Indictment

As an initial matter, the defendants argue that the Magistrate Judge should not have ruled on their motion to dismiss at all. The defendants first raised the argument addressed in this section in a motion to dismiss the original indictment. *See* R. 44; R. 49. After the superseding indictment was filed, the Magistrate Judge issued a report and recommendation that applied the arguments in the defendants' original motion to dismiss to the superseding indictment. *See* R. 63. The defendants objected, arguing that the Magistrate Judge's

---

[5] The defendants also argue that they did not violate section 2155 because their actions exposed serious security flaws at Y-12, which led the government to put new security measures into place to make the complex more secure. *See* R. 99 at 5; *see also* R. 105-1 at 3 (affidavit of retired Colonel Mary Annette Wright). That argument challenges the sufficiency of the evidence behind the indictment, which the defendants cannot challenge on a motion to dismiss. *See United States v. Levin*, 973 F.2d 463, 468 n.2 (6th Cir. 1992) ("[A] defendant may not challenge an indictment on the ground that it is not supported by sufficient evidence before the grand jury." (internal alterations and quotation omitted)).

decision to do so violated their due process rights because they had no opportunity to address how their motion applied to the new section 2155 charge. *See* R. 71 at 2. The Magistrate Judge's decision to rule on the first motion to dismiss did not harm the defendants or violate their rights in any way. First, in their second motion to dismiss, filed in response to the superseding indictment, the defendants "reassert[ed] and appl[ied] their arguments from their original [motion] to the new charges" in the superseding indictment. R. 72 at 11. In other words, the defendants asked the Magistrate Judge to do exactly what they faulted him for doing in their objection to the first report and recommendation. Second, this Court reaches the same conclusion as the Magistrate Judge after de novo review of the defendants' objections. So, even if the Magistrate Judge should not have applied the defendants' initial motion to dismiss to the superseding indictment, the end result is the same.

The defendants moved to dismiss the charges against them based on an intricate, but ultimately ineffective line of reasoning. The defendants argue that the government's production, possession, and potential deployment of nuclear weapons all violate international law. *See* R. 44; R. 72 at 11. The basic purpose of the statutes that the defendants are charged under is to protect government property, and the government property in this case is part of the nuclear program. The defendants argue that domestic statutes must be interpreted consistently with international law. *See* R. 49 at 15–16. From that, they conclude that the statutes they are charged under do not apply when the damaged property is being put to a use that is unlawful under international law. *See id.* at 16–18; *see also* R. 50 at 17–18.[6]

---

[6] The government, in its motion to preclude certain defenses, characterizes this argument as a defense. To the extent that the defendants also wish to raise this argument as a defense at trial, *see, e.g.*, R. 49 at 17, they may not do so for the same reasons that the indictment need not be dismissed.

The defendants' argument depends on a link in their chain of reasoning that simply does not exist. The charges in the superseding indictment each use the term "premises" or "property." *See* 18 U.S.C. §§ 1361, 1363, 2155. In the defendants' view, a building ceases to be a "premises" or "property" within the meaning of criminal statutes if that building is being put to a use that violates international law. Not so. *United States v. Allen*, 760 F.2d 447 (2d Cir. 1985), is instructive. In *Allen*, antinuclear protestors entered Griffiss Air Force Base and damaged a hangar and a B-52 bomber. *See id.* at 449. The defendants were charged under 18 U.S.C. § 1361, the basis for count three of the indictment against the defendants in this case. *See id.* Like the defendants in this case, the *Allen* defendants argued that nuclear weapons violated international law. The court explained that the defendants' argument "fail[ed] to distinguish between two different and independent government actions: protection of property and production of nuclear weapons." *Id.* at 453; *see also United States v. Urfer*, 287 F.3d 663, 667 (7th Cir. 2002) ("Even if it were contrary to international law for a nation to possess nuclear weapons, domestic law could properly and does make it a crime to correct a violation of international law by destroying government property." (quotation omitted)); *United States v. Davis*, 905 F.2d 245, 248 (9th Cir. 1990) ("Contrary to [the defendant's arguments], compliance with international law does not determine whether the United States may apply the Act to his conduct."); *United States v. Komisaruk*, 885 F.2d 490, 497 (9th Cir. 1989) ("Komisaruk contended that the illegality of the Navstar system under principles of international law stripped the computer of its status as property of the United States. The district court properly rejected this fanciful argument.").

12

Defendants provide no authority for their view, and an example shows why none exists. Assume that the United States, facing a severe budget crisis, decides to bar people who qualify as refugees under the relevant international treaties from entering the country. A group of sympathetic citizens creates a modern-day underground railroad to smuggle the would-be refugees into the United States. They are caught and prosecuted under 18 U.S.C. § 1324 with "bringing in and harboring" unlawful aliens. The group's actions, however well intentioned, would be unlawful. *Cf. United States v. Merkt*, 794 F.2d 950, 964 & n.16 (5th Cir. 1986) (holding that even if aliens qualified as refugees under international law, defendants had still violated 18 U.S.C. § 1324(a) by assisting the aliens' unauthorized presence in the United States). But under the defendants' view of the interaction between government violations of international law and individual violations of domestic law, that group could not be convicted. As the example shows, the defendants' theory amounts to the creation of a self-help remedy for citizens who think that their government is violating international law. No such remedy exists. Nor does this Court have the authority to create such a remedy. *Cf. Sosa v. Alvarez-Machain*, 542 U.S. 692, 728 (2004) (directing courts to proceed with "great caution in adapting the law of nations to private rights").[7]

The defendants point to a canon of statutory construction that statutes should be interpreted to be consistent with international law, if possible. *See, e.g.*, R. 50 at 15–16. That canon does not help them. The canon comes into play only where the application of a

---

[7] The same analysis applies to the defendants' claim that the production and use of nuclear weapons violates 18 U.S.C. § 2441, which criminalizes the commissions of war crimes. Section 2441 applies to individuals, not the government. But even assuming the government has violated section 2441 by maintaining a nuclear weapons program, there is no reason why that violation gave the defendants free license to violate other, distinct portions of the criminal code.

statute would violate international law. *See Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 117–18 (1804). The defendants cite no authority for the proposition that their conviction under the statutes in the superseding indictment would violate international law.

The defendants' motion to dismiss on the basis of international law fails because even assuming nuclear weapons are unlawful under international law, the government may still criminalize the destruction of property on which the government carries out its nuclear weapons program.

## III.    Motion To Preclude Certain Defenses

The United States moved to preclude the defendants from relying on certain defenses at trial. R. 45. At various points, the defendants argue that a ruling limiting their ability to present these defenses would subject them to "strict liability" for their offenses. For starters, all three of the statutes the defendants are charged under have an intent element, so none are strict liability offenses. More importantly, the defendants conflate their broad right to defend against criminal charges with their ability to present a specific defense. Rulings on potential defenses deal with whether the defendants have met their burden to show that they can present evidence that will support the defense. They do not bar the defendants from presenting any defense at all. *See United States v. Maxwell*, 254 F.3d 21, 26 (1st Cir. 2001) (describing a similar "strict liability" argument as a "red herring").

### a.    Necessity

A successful defense of necessity allows a defendant to avoid a conviction even though the government has proven all of the elements of an offense. *See United States v. Ridner*, 512 F.3d 846, 849 (6th Cir. 2008). There are five elements to a necessity defense.

First, the defendant must have a reasonable fear of death or serious bodily injury due to a present, imminent, and unlawful threat. Second, the defendant must not have recklessly created a situation where he would likely face such a threat and be forced to violate the law. Third, the defendants must not have had "a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm." *Id.* at 850 (quotation omitted). Fourth, the defendant must reasonably have anticipated that there would be a "direct causal relationship" between the crime and the avoidance of the threat. *United States v. Singleton*, 902 F.2d 471, 472 (6th Cir. 1990) (citation omitted). Finally, the defendant must have ceased the illegal conduct as soon as that conduct was no longer necessary. *See United States v. Newcomb*, 6 F.3d 1129, 1134–35 (6th Cir. 1993).

If this seems like a difficult test for defendants to meet, it is. The necessity defense applies in only "rare situations." *Singleton*, 902 F.2d at 472 (citation omitted). The defense involves a cost-benefit analysis because the defendant admits that he violated the law but argues that his choice to do so "was properly exercised to achieve the greater good." *Newcomb*, 6 F.3d at 1133 (quotation omitted). Thus, a successful necessity defense implicitly amends the criminal code to carve out, and on some level to approve of, the defendant's actions. *See United States v. Schoon*, 971 F.2d 193, 196–97 (9th Cir. 1991) ("[T]he necessity defense allows us to act as individual legislatures, amending a particular criminal provision . . . when a real legislature would formally do the same under those circumstances."). Put in those terms, it is not hard to understand why the defense is a narrow one. If broadly employed, the defense would trump the decisions of the democratically elected legislature, the branch best suited to make these kinds of utilitarian judgments.

Necessity is a question for the jury, but the defense does not reach the jury unless the defendant can make an evidentiary showing that meets "a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support [the] defense." *United States v. Bailey*, 444 U.S. 394, 415 (1980);[8] *see also Singleton*, 902 F.2d at 473 ("[T]he district court did not err in refusing to instruct the jury on this defense if the evidence could not support a verdict based on it."). The government argues, and the Magistrate Judge agreed, that the defendants have not met that standard. *See* R. 45 at 4–8; R. 90 at 16–22. This Court agrees as well.

A Present, Unlawful, and Imminent Threat That Induced a Reasonable Fear of Death or Bodily Injury: The defendants argue that they acted to prevent: (1) death and injury from the use of nuclear weapons or accidental detonation of nuclear weapons, (2) injury or death of uranium miners, and (3) cancer from the production and storage of nuclear weapons at Y-12. *See* R. 90 at 18. Those threats, while potentially serious, are not imminent. Imminent means about to happen. *Compare Ridner*, 512 F.3d at 851 (holding that the necessity defense was unavailable to a defendant who pocketed ammunition to keep it away from his suicidal brother when his brother did not have access to a gun at the time), *with Newcomb*, 6

---

[8] The defendants repeatedly quote *Bailey* as holding that: as long as defendants can meet "a minimum standard as to each element of the defense, assuming the defense is available as a matter of law, a trial judge may not take the question . . . away from the jury." R. 50 at 5; R. 99 at 11. *Bailey* does not contain the quoted language. Instead, *Bailey* says:

> And in the federal system it is the jury that is the judge of whether the prisoner's account of his reason for flight is true or false. But precisely because a defendant is entitled to have the credibility of his testimony, or that of witnesses called on his behalf, judged by the jury, it is essential that the testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense-here that of duress or necessity. *Bailey*, 444 U.S. at 415.

F.3d at 1136 (holding that a defendant could present a necessity defense to a felon-in-possession charge when he took a gun and ammunition from another person who was running away to kill someone), *and* Webster's Third New Int'l Dictionary, 1130, 1132 (unabridged ed. 1993) (defining "imminent" as "ready to take place: near at hand: impending"). The three harms the defendants point to may happen at some point, but the defendants cannot show that they will happen tomorrow, next month, or even next year. So the harm the defendants sought to avoid was not an imminent harm, and the necessity defense is unavailable to them. *Cf. United States v. Tokash*, 282 F.3d 962, 970 (7th Cir. 2002) (explaining that "future" or "later" and "imminent" are opposites).

The defendants argue that the harm from nuclear weapons is inevitable and very large, which means that the imminence requirement should be relaxed. *See* Objections, R. 99 at 14. Their witness, former Attorney General Clark, made the same claim during his testimony at the hearing held on April 23, 2013. But the imminence requirement is not just cosmetic. It insures that the defense is limited to defendants faced with a split-second decision between breaking the law and allowing a serious harm to happen. And the Sixth Circuit has foreclosed the defendants' argument that magnitude of harm can substitute for imminence of harm. *See Ridner*, 512 F.3d at 851 ("[T]he legitimacy and nature of the threat cannot compensate for the lack of immediacy.").

No Reasonable, Legal Alternative: The defendants argue they had no reasonable, legal alternative to entering the Y-12 complex. *See* R. 50 at 11; R. 99 at 16. But of course they did. The defendants can protest outside the complex, as many do. They can lobby the legislature. They can lobby their fellow citizens through letters to the editor, mailings, and

in-person interactions. The defendants' own witness, former Attorney General Clark, conceded that the defendants had reasonable alternatives, although he stressed that those alternatives were unlikely to succeed.

The defendants argue that those options are not "reasonable" because the defendants tried them already and they did not lead to a change in the government's policy on nuclear weapons. *See* R. 50 at 11−12. That interpretation would require courts to allow "a defense to criminal charges whenever [the defendant] disagrees with a result reached by the political process." *United States v. Dorrell*, 758 F.2d 427, 432 (9th Cir. 1985). The very point of democratic government is to channel policy disagreements through a transparent and participatory political process that inevitably leaves some unhappy with the result. A prior loss in the political process does not render the political process an unreasonable alternative to breaking the law. *See Maxwell*, 254 F.3d at 29.

Direct, Causal Relationship: The defendants also cannot show that they had a reasonable belief that their entry into the Y-12 complex would directly lead to a change in the government's nuclear policy. The defendants argue that acts of civil disobedience can lead to change, even if that change takes place over a period of time. *See* R. 50 at 13–14. That amounts to an argument that if someone commits an act of civil disobedience, they are per se entitled to the necessity defense. Not so. If anything, courts have held that indirect acts of civil disobedience to protest the government's nuclear policies are the *least likely* to qualify for the necessity defense. *See Maxwell*, 254 F.3d at 28 ("Maxwell could not reasonably have anticipated that his act of trespass would avert the harm that he professed to fear."); *Schoon*, 971 F.2d at 199 ("[W]e see the failure of any federal court to recognize a

18

defense of necessity in a case like ours not as coincidental, but rather as the natural consequence of the historic limitation of the doctrine."); *Kabat*, 797 F.2d at 592 ("[I]n political protest cases a sufficient causal relationship between the act committed by the defendants and avoidance of the asserted 'greater harm' inevitably will be lacking."); *Dorrell*, 758 F.2d at 434 ("Dorrell offers no indication of how he expected his conduct to bring about a change in the MX missile program or a reduction in the risk of nuclear war[, so] the district court's decision to reject the necessity defense as a matter of law was correct."); *United States v. Cassidy*, 616 F.2d 101, 102 (4th Cir. 1979) (holding that defendants convicted under 18 U.S.C. § 1361 for defacing the Pentagon walls to protest nuclear weapons could not satisfy the "elements of lack of other adequate means or direct causal relationship").

The defendants imply that this is an unjust result because civil disobedience does lead to change over time. *See* R. 99 at 16. But the direct, causal relationship requirement ensures that the courts and the jury do not step too far over the line and usurp the role of the legislature. As explained above, the necessity defense exempts a defendant from liability when his criminal act clearly averted much more harm than it caused. The direct, causal relationship requirement ensures that a court (or a jury) can accurately make that cost-benefit calculation. When, as here, the link between the defendants' actions and the potential harm avoided is tenuous, the calculation becomes a guess. When that happens, the justification for allowing the court or the jury to serve as an impromptu legislature to amend the criminal statute disappears. A democratically-accountable legislature that can solicit testimony from a

wide range of perspectives is well-suited to make the cost-benefit call when the right answer is unclear.  The courts and the jury are not.

Because the defendants do not have any evidence to establish three of the four required elements of the necessity defense, they cannot raise the necessity defense at trial.

### b.  Nuremberg Defense

The Magistrate Judge correctly explained why the defendants cannot assert the Nuremberg principles as a defense.  *See* R. 90 at 23–24.  At the Nuremberg trials, the tribunals held that defendants could not argue that their war crimes were excused by the fact that they were following domestic law.  *See Kabat*, 797 F.2d at 590.  In other words, compliance with domestic law is not an excuse for the commission of war crimes that violate international law.

The defendants cannot access the Nuremberg defense because they did not need to violate domestic law to avoid committing a war crime.  It is not as if the government forced the defendants to build nuclear weapons or participate in the nuclear weapons program in any way.  Indeed, the defendants' entire theory is that the *government* is committing war crimes and that they felt obligated to try and stop the government.  The defendants have not done anything that places them at risk of being charged with war crimes, as their witness, former Attorney General Clark, stated.  Therefore, the Nuremberg principle does not apply, and they "can claim no privilege to violate domestic law to protect themselves."  *Id.*; *see also Maxwell*, 254 F.3d at 30 ("[A]n individual cannot assert a privilege to disregard domestic law in order to escape liability under international law unless domestic law forces that person to violate international law."); *United States v. Montgomery*, 772 F.2d 733, 737 (11th Cir.

1985) ("Defendants in the case before us stand [the Nuremberg] doctrine on its head in arguing that a person charged with no duty or responsibility by domestic law may voluntarily violate a criminal law and claim that violation was required to avoid liability under international law."); *Allen*, 760 F.2d at 453 (stating that the court was unaware of any law "even suggesting that an individual has the responsibility to correct a violation of international law by destroying government property").

### c. First Amendment

The Magistrate Judge correctly explained that the First Amendment does not provide an affirmative defense for the defendants because the interior of the Y-12 complex is not a public forum. *See* R. 90 at 31–32. The defendants' objection is not directly responsive to the Magistrate Judge's reasoning. The defendants argue that an order that does not allow them to present evidence on the intent element of the offenses they are charged with will violate their First Amendment rights. R. 99 at 21. But nothing in the Magistrate Judge's reasoning or this opinion bars the defendants from arguing that the government has not met its burden on the intent element or from presenting their own evidence on the intent element.

### d. The Defendants' Religious, Moral, and/or Political Beliefs

The defendants argue that they must be able to present evidence on their religious, moral, and political beliefs because that evidence is needed to negate the specific intent element of 18 U.S.C. § 2155. *See* R. 99 at 20–21. The Magistrate Judge explained that while their beliefs might speak to their motive, those beliefs were not relevant to the question whether the defendants intended to injure the national defense. *See* R. 90 at 25–31.

Section 2155 contains two elements. The first is a specific intent element. The defendants must have had "intent to injure, interfere with, or obstruct the national defense of the United States." The second is the injury element. The defendants must have "willfully injure[d], destroy[ed], contaminate[ed] or infect[ed], or attempt[ed to do those things] any national-defense material, national-defense premises, or national-defense utilities."

The specific intent element asks whether the defendants intended to injure, interfere with, or obstruct the national defense. As the *Kabat* court explained, assuming that intent can be proven, the *reason* for the intent is irrelevant. The specific intent element of section 2155 is aimed at those who deliberately impede the national defense. That category includes both "persons who take it upon themselves to correct national defense policies [and] persons who act from anti-U.S. animus." *Kabat*, 797 F.2d at 587. In other words, if the defendants intended to impede the nuclear weapons program, it does not matter that they also believed that the United States would be better off without that program. *See Platte*, 401 F.3d at 1181 ("[I]f the law being violated is constitutional, the worthiness of one's motives cannot excuse the violation in the eyes of the law.").

## IV.    Motion For Discovery

Both the defendants and the government find fault with the Magistrate Judge's ruling on the defendants' discovery motions.

The defendants moved for discovery on the type of nuclear weapons produced at Y-12, the number of nuclear weapons produced at Y-12, and the components of those weapons. *See* R. 46. The Magistrate Judge denied the motion because the request dealt with "publicly available information not within the custody or control of the [prosecutor] or the

investigating [] agencies." R. 90 at 6. The defendants' objection states that the information is material to its defense, but the defendants do not argue that the material is not available in the public domain. *See* R. 99 at 5–6. In fact, the defendants later asked this Court to take judicial notice of various facts about the type, number, and components of nuclear weapons produced at Y-12. The defendants found those facts on various government websites. *See* R. 119; R. 119-1. Because the defendants' objection does not argue that the Magistrate Judge incorrectly found that the requested discovery was in the public domain, the objection fails.

The defendants also moved for discovery on the call and alarm records at the Y-12 complex for the month before and the month after their actions. *See* R. 47. The Magistrate Judge granted the motion in part and denied the motion in part. The defendants argued that the records are material because they plan to argue that the defendants could not have caused $70,000 in damage to the Y-12 complex in the short time they were on the premises. *See* R. 90 at 8 (describing defendants' argument at motions hearing). The Magistrate Judge agreed that the call or alarm records on the date of the defendants' actions are material, but he disagreed with the defendants that any other call or alarm records were material. *See id.* at 8–9. The government objected. *See* R. 100. The government argues that the alarm and call records are classified and are not material to the defendants' defense under Federal Rule of Criminal Procedure Rule 16 for two reasons. First, the defendants have admitted to being in the Y-12 complex for several hours. *See id.* at 3–4. Second, the government has provided the defendants with surveillance footage and photographs that document the defendants'

actions and the damage to the Y-12 complex. The call and alarm records, the government argues, will not help the defendants refute that evidence at trial. *See id.* at 5.

The government's objection contains two missteps. First, the government reads the word "successful" into Rule 16. Rule 16(a)(1)(E) requires the government, upon the defendants' request, to allow the defendants access to evidence in its control that is "material to preparing the defense." Evidence is material if it can act as a "shield [and] refute the Government's arguments that the defendant committed the crime charged." *United States v. Lykins*, 428 F. App'x 621, 624 (6th Cir. 2011) (internal quotation marks omitted). The evidence must "alter the quantum of proof in [the defendants'] favor," which is assessed by considering "the importance of the information in light of the evidence as a whole." *Id.* (internal quotation marks and citation omitted). The call and alarm records are material because they are evidence of the extent of the disruption the defendants caused at the Y-12 complex, which is relevant to the damage element of section 2155. The government's objection boils down to a requirement that the requested evidence be "material to preparing the *successful* defense," but Rule 16 does not contain the word successful. And, in any event, Rule 16 simply establishes the "minimum amount of discovery to which the parties are entitled." *United States v. Semrau*, 693 F.3d 510, 529 (6th Cir. 2012). The Court retains the "discretion to grant or deny the broader discovery requests of a criminal defendant." *Id.* The government states that the call and alarm records are classified but has not provided any evidence of that fact. So the government has not provided a compelling reason for not disclosing those records to the defendants

Because the call and alarm records from the morning of the defendants' incursion into the Y-12 complex are arguably material to the defense, the Magistrate Judge correctly ordered the government to disclose those records to the defense.

## V. Motion For a Bill of Particulars

The purpose of a bill of particulars is "to minimize surprise and assist [the] defendant in obtaining the information needed to prepare a defense." *United States v. Salisbury*, 983 F.2d 1369, 1375 (6th Cir. 1993) (citations omitted). The bill is not a means for defendants "to obtain detailed disclosure of all evidence held by the government before trial." *Id.*

The defendants sought a bill of particulars that would require the government to clarify the facts underlying the injury of national-defense premises count. R. 48; R. 76. The first motion asked the government to: (1) list the buildings and structures at issue and (2) describe the purpose of those buildings and structures and (3) specify the role those buildings and structures play in the production and storage of nuclear weapons. *See* R. 45 at 1. The second asked the government to clarify: (1) the buildings or items that (2) the defendants injured, destroyed, or contaminated and (3) how that injury, destruction, or contamination negatively impacted the national defense. *See* R. 76 at 7.

The Magistrate Judge recommended that the first motion for a bill of particulars be denied. The defendants conceded that the government had already disclosed—through the indictment and through discovery—that the HEUMNF, concrete barriers, security fences, and perimeter fences were the buildings and structures at issue. *See* R. 90 at 10, 14. The government explained that the public domain and the government's filings and statements during this case contained information about the purpose of those buildings and structures

and their role in the government's nuclear weapons program. The Magistrate Judge agreed. *See id.* at 12. Thus, the defendants already had sufficient information to avoid surprise and to prepare a defense.

The Magistrate Judge recommended that the second motion for a bill of particulars be granted in part and denied in part. Through the indictment and other filings, the government has explained that the defendants cut fences and painted and splashed blood on the HEUMNF. *See* R. 90 at 10. The Magistrate Judge found that the government's explanation was enough to avoid surprise and to prepare a defense. However, the Magistrate Judge did recommend that the government provide the last piece of information that the defendants requested—how their actions harmed the national defense. *See id.* 12–14. The term "national defense," used in 18 U.S.C. § 2155(a), is broad, and that breadth poses a potential for surprise. To minimize any surprise, the Magistrate Judge ordered the government to explain how the defendants harmed the national defense. *See id.*

The defendants' first objection simply states that the Magistrate Judge should have granted both motions in full. *See* R. 99 at 7. The defendants do not explain why they believed the Magistrate Judge erred, and this Court cannot find an error in the Magistrate Judge's reasoning.

The defendants' second objection is not really an objection at all. Rather, the defendants argue that the bill of particulars filed by the government in response to the Magistrate Judge's memorandum opinion and order is inadequate. *See* R. 99 at 7; R. 102. The bill states that the defendants' "intrud[ed] upon and damage[ed] Y-12 property," which "caused a significant institutional and security response, which did disrupt operations at Y-

12." R. 98 at 1. The bill also states that the "operations of Y-12 are critical to the national defense of the United States." *Id.* at 2. At the April 23, 2013, hearing, the government further particularized the intended harm. The government stated that at trial it would show that the defendants intended to cause disruptions at the Y-12 complex. The defendants then agreed that the government's statements sufficiently particularized the intended harm, which means that their objection is now moot. *See* R. 122 at 3 (denying a renewed motion to dismiss as moot on that basis).

## CONCLUSION

Accordingly, it is **ORDERED** that:

(1)     The Court **OVERRULES** the defendants' objections, R. 71, and **ADOPTS** and **ACCEPTS** Magistrate Judge C. Clifford Shirley, Jr.'s Report and Recommendation, R. 63, denying the motions to dismiss, R. 44 and R. 72.

(2)     The Court **OVERRULES** the defendants' objections, R. 89, and **ADOPTS** and **ACCEPTS** Magistrate Judge C. Clifford Shirley, Jr.'s Report and Recommendation, R. 85, denying the second motion to dismiss or for a bill of particulars, R. 72.

(3)     The Court **OVERRULES** the defendants' objections, R. 99, and the government's objections, R. 100, and **ADOPTS** and **ACCEPTS** Magistrate Judge C. Clifford Shirley, Jr.'s Memorandum Opinion and Order, R. 90, granting the government's motion to preclude, R. 45, denying the defendants' motion for discovery, R. 46, granting in part the defendants' motion for specific discovery, R. 47, denying the defendants' motion for a bill of particulars, R. 48, and granting in part the defendants' second motion for a bill of particulars, R. 72.

This the 30th day of April, 2013.



Signed By:

_**Amul R. Thapar**_

**United States District Judge**