UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 3:12-CR-00107 |
| v. ) | |
| ) | Hon. Amul R. Thapar, USDJ |
| MICHAEL R. WALLI, ) | Hon. C. Clifford Shirley, Jr., USMJ |
| MEGAN RICE, and ) | |
| GREG BOERTJE-OBED ) | |

## Defendants' Joint Response to the Court's Request for Information from Friend-of-the-Court Professor Douglas A. Berman

Now into Court come defendant Michael Walli and his codefendants Sister Megan Rice and Greg Boertje-Obed, who respectfully respond through undersigned counsel to this Court's request for guidance on three questions posed to Friend-of-the-Court Professor Douglas A. Berman. Rec. Doc. 299. This Court asked Professor Berman to provide guidance on the following: (1) whether the Court should define the "heartland" by the United States' charging decisions or the intentions of Congress and the Sentencing Commission; (2) whether 18 U.S.C. § 2155(a) captures a broad range of conduct, from peace protestors to treasonous acts and how should the Court account for that, if it can; (3) how should the Court determine what is "exceptional" for purposes of justifying a downward departure for all three defendants and should the defendants' "good works" instead by considered within the § 3553(a) rubric rather than as a downward departure. Rec. Doc. 299.

Defendants through undersigned counsel will address each question in detail below, but agree with Professor Berman's suggestion that this Court follow the United

1

States Supreme Court's guidance in *United States v. Koon*, 518 U.S. 81, 101 (1996) and sentence these three fairly, proportionately to similarly situated defendants, and after considering all mitigating evidence they have offered to the Court.

I. **Defining the "heartland" of § 2155(a)**

Defendants contend that there is no established "heartland" based on current case law for the "typical sabotage case" and agree with Professor Berman's reading of *Koon* and statement that "it [is] improper for a district court to have its heartland analysis primarily informed by general prosecutorial practices or by the general intent of Congress or the Sentencing Commission." *See* Friend of the Court Brief, at 3. Defendants agree with Professor Berman's heartland analysis and statement that the sentencing court has the "unique discretion to consider fact specific circumstances of the case and the unique factors about which a district court has special competence due to its distinctive vantage point and day-to-day experience in criminal matters." *See* Friend of the Court Brief, at 4 (*quoting* Koon, 518 U.S. at 98-100) (internal quotation marks omitted).

Defendants believe, however, that the legislative history behind Congress's enactment of 18 U.S.C. § 2155(a) is instructive. Additionally, Defendants do not believe that the Sentencing Commission's intention in promulgating U.S.S.G. § 2M2.3 is helpful because the guideline provides no guidance as to whom it is intended. Rather, as Professor Berman explains, the single base offense level and the fact that § 2M2.3 incorporates no specific offense characteristics indicate that this Court should depart from the guidelines or grant a variance because the conduct of these defendants has not been factored into § 2M2.3.

As this Court has acknowledged, this case is unique in that it is a case of first impression for the Sixth Circuit. The government has never before decided to charge defendants under 18 U.S.C. § 2155(a) within this Court's jurisdiction. Also, there are only a handful of cases in the country that have confronted the issue of how to define "the heartland" of cases where defendants have been charged under this statute. And as this Court noted during defendants' sentencing hearing on January 18, 2014, the only civilian defendants charged under this statute have been similarly situated peaceful protesters. *See United States v. Sicken*, 223 F.3d 1169 (10th Cir. 2000); *United States v. Kabat*, 797 F.2d 580 (8th Cir. 1986) and *United States v. Platte*, 401 F.3d 1176 (10th Cir. 2005).[1] The other handful of defendants charged with violating this statue have been members of the Armed Forces. *See*, *for example*, *United States v. Johnson*, 15 M.J. 676 (A.F.C.M.R. 1983); *United States v. Ortiz*, 24 M.J. 164 (C.M.A. 1987); *United States v. Stewart*, 42 C.M.R. 19, 1970 WL 6967 (C.M.A. 1970); *United States v. Johnson*, 24 M.J. 101 (C.M.A. 1987); and *United States v. Banks*, 7 M.J. 501(A.F.C.M.R. 1979).

With so few cases to look to, this Court is indeed in a predicament as to how to determine the "heartland" of § 2155(a). Defendants urge this Court to look to similar cases from the Tenth Circuit in *United States v. Sicken*, 223 F.3d 1169 (10th Cir. 2000) and *United States v. Platte*, 401 F.3d 1176 (10th Cir. 2005). Without being able to determine a "typical sabotage case" due to the scarcity of jurisprudence concerning civilian defendants to consider, those courts decided to define the "heartland" by considering current case law, i.e. *Kabat*, the language of the statute, and the language of § 2M2.3 as well as the specific mitigating circumstances and facts of each offense and

---

[1] The only exception found is *United States v. Melville*, 309 F. Supp. 774 (S.D.NY 1970) where four defendants, Samuel Joseph Melville, John Hughey, III, Jane Alpert and Patricia Swinton were charged with the use of explosive bombs to destroy and sabotage federal and national defense utilities.

each defendant. In doing so, both the *Sicken* and *Platte* courts found that cases such as this fall outside of the "heartland" of the cases § 2155(a) intended to reach and that the statute clearly was intended to apply to "serious" offenses. *See Sicken*, 223 F.3d at 1170 and 1174 and the Judgment in *United States v. Platte*, 02-CR-509, July 25, 2003 (Attachment 1).

Defendants urge this Court to consider the historical record in order to determine Congress's intent in enacting § 2155(a). Although the legislative history of § 2155(a) is "confusing at best,"[2] what is known about it is that this statute was first signed into law as an amendment to the Federal Sabotage Act, enacted in 1918 and codified as 18 U.S.C. § 2153(a).[3] The Federal Sabotage Act only applied during wartime, but was amended in 1940 to apply during times when the nation was not at war.[4] The Sabotage Act was passed during World War I amidst real and perceived fears of enemies abroad and within the nation's borders.[5] The Espionage Act was passed the year before,[6] after President Wilson asked Congress to clamp down on disloyal foreign-born Americans in his State of the Union Address on December 7, 1915, stating:

> There are citizens of the United States, I blush to admit, born under other flags but welcomed under our generous naturalization laws to the full freedom and opportunity of America, who have poured the poison of disloyalty into the very arteries of our national life; who have sought to bring the authority and good name of our Government into contempt, to destroy our industries wherever they thought it effective for their vindictive purposes to strike at them, and to debase our politics to the uses of foreign intrigue…

---

[2] *United States v. Johnson*, 15 M.J. 676, 677 (A.F.C.M.R. 1983) (stating, "the legislative history is opaque and confusing at best...")
[3] *See* Pub. L. No. 65-135, §§ 1-3, 40 Stat. 533 (1918) and U.S.C. 18 § 2153(a) (2014).
[4] *See* Pub. L. No. 76-886, § 5, 54 Stat. 1220-21 (1940). Currently codified as amended as 18 U.S.C. 2155(a) (2014).
[5] *See* Philip Jenkins, "Spy Mad?" Investigating Subversion in Pennsylvania, 1917-1918, 63 Penn. History, 204 (Spring 1996).
[6] Formerly 50 U.S.C.A. § 31 et seq (June 15, 1917), codified as amended 18 U.S.C. § 2388 (2014).

Like the original Sabotage Act, the amended Section 2155(a) was enacted on November 30, 1940 during a time when the United States was preparing to enter World War II.[7] The third session of the seventy-sixth Congress passed a number of bills strengthening the nation's military defense, including the first peacetime Compulsory Military Training Act.[8] While the country did not officially declare war until the Japanese bombing of Pearl Harbor, President Roosevelt had been steadily building the country's national defense and readying the nation for war.[9] The political climate is noteworthy both in 1918 when the Sabotage Act was initially passed and in 1940 when it was amended. During both sessions of Congress, the United States was either at war or actively preparing for war and Congress's enactment of and amendment of § 2155(a) was aimed at protecting the country's national defense systems during those times of emergency.

Congress had similar intentions when it most recently amended the statute by passing the PATRIOT Act in October of 2001, approximately one month after the attack on the World Trade Center Towers on September 11, 2001.[10] It made a number of changes to existing legislation and its explicit purpose was "[to] deter and punish terrorist acts in the United States and around the world, to enhance law enforcement investigatory tools, and

---

[7] Pub. L. No. 76-886, § 5, 54 Stat. 1220-21 (1940).
[8] *See, for example*, Pub. L. No. 588, 76th Cong., 3d Sess., 54 STAT. c. 313 (June 11, 1940); Pub. L. No. 611 (both seeking increases in military appropriations for the Navy and Military forces). *See also* Pub. L. No. 783, 76th Cong., 3d Sess., 54 STAT. c. 720 (Sept. 16, 1940) ("Compulsory Military Training Act"). 76th Cong., 3d Sess., 54 STAT. c. 343 (June 13, 1940). *See also* Federal Legislation: Democracy in a Time of Emergency, 30 Geo L.J. 63, 1941-1942 (providing an overview of all the legislation passed in preparation of war by the seventy-sixth Congress from 1939 to 1941).
[9] Public Broadcasting Services (PBS), Foreign Affairs, http://www.pbs.org/wgbh/americanexperience/features/general-article/fdr-foreign/
[10] UNITING AND STRENGTHENING AMERICA BY PROVIDING APPROPRIATE TOOLS REQUIRED TO INTERCEPT AND OBSTRUCT TERRORISM (USA PATRIOT ACT) ACT OF 2001, Pub. L. 107-56, H.R. 3162 (Oct. 26, 2001). *See also* Neila A. Lewis, *A Nation Challenged: Congress; Negotiators Back Scaled-Down Bill To Battle Terror,* New York Times (Oct. 2, 2001) http://www.nytimes.com/2001/10/02/us/a-nation-challenged-congress-negotiators-back-scaled-down-bill-to-battle-terror.html?ref=usapatriotact.

for other purposes." *See* PATRIOT Act, *supra*. The Act amended § 2155(a) by increasing the punishment from 10 years to 20 years and to life in prison if any person dies as a result. *See* PATRIOT ACT, p. 101. Again, Congress amended this statute during a time of war and out of a need to protect the nation's borders and defense.

What is clear from the legislative history is that at each significant time when § 2155(a) was enacted and amended, Congress was either at war or preparing for war. In light of this history and without a clearer message from Congress as to whether this statute was intended to apply to such peaceful protesters as Michael, Greg, and Sister Megan, it is ultimately up to the Court to make that determination. Both the *Sicken* and *Platte* courts as well as the dissent in *Kabat* did not believe that Congress intended this statute to apply to peaceful protesters who trespassed on government property to commit acts of symbolic disarmament.

## II. The Guidelines are Discretionary

After *United States v. Booker*, 543, U.S. 220 (2005) courts are no longer required to treat the Sentencing Guidelines as mandatory. Instead the Guidelines should serve as the benchmark, the starting point, and be treated as one of the § 3553(a) factors the district court must consider as a whole. *See Booker*, 543 U.S. at 245 (Guidelines are advisory); *Kimbrough v. United States*, 552 U.S. 85, 90-91 (2007) (Guidelines are one factor among several courts must consider). *See also United States v. Collington*, 461 F.3d 805 (6th Cir. 2006) (stating that post-*Booker* a sentencing court has "greater latitude" to sentence outside the guideline range") (quotation omitted).

Additionally, where a district court has a policy disagreement with the Guidelines even in a "mine-run" case, the court has the discretion to depart from the Guidelines as

6
Case 3:12-cr-00107-ART-CCS   Document 315   Filed 02/17/14   Page 6 of 13   PageID #: 4213

long as it articulates its "sufficiently compelling reasons" for doing so. *See Pepper v. United States*, 131 S. Ct. 1229 (2011) (remanding for resentencing because the court of appeals erred in prohibiting the district court from exercising its discretion based on policy disagreements and granting defendant a downward variance based on postsentencing rehabilitation); *United States v. Boardman*, 528 F. 3d 86 (1st Cir. 2008) (remanding for reconsideration post-*Kimbrough* because the district court erred in believing it did not have the discretion to grant a downward variance because the crime was nonviolent based on a policy disagreement with the Guidelines); *United States v. Herrera-Zuniga*, 571 F.3d 568 (6th Cir. 2009) (affirming an upward variance in an illegal entry case where the district court expressed a policy disagreement with the guideline); and *United States v. Lychok*, 578 F.3d 214, 219 (3d Cir. 2009) (finding that a sentence based on a policy disagreement must be based on "sufficiently compelling reasons to justify it.").

Additionally, courts can grant departures when cases are atypical and not adequately considered under the Guidelines. *See Koon v. United States*, 518 U.S. 81 (1996). The courts in *Sicken* and *Platte* both found that because § 2155(a) did not take into consideration varying levels of harm and did not differentiate between a terrorist bomber and a peace activist trespassing and spilling their own blood on government property, those courts determined that a downward departure was warranted because the peaceful protester defendant presents an atypical case. *See Sicken*, 223 F.3d at 1175-76 and the Judgment in *United States v. Platte*, 02-CR-509, July 25, 2003 (Attachment 1). The district court in *Sicken* considered the Sentencing Commission's own acknowledgement that § 2M2.3 was too broad. *See Sicken*, 223 F. 3d at 1176. *See also*
7

Sentencing Guidelines for United States Courts, 62 Fed. Reg. 152-01, 196 (1997) (According to the application note in the proposed amendment, a departure may be warranted because "it is not possible to include all of the potentially relevant circumstances in the offense level." [and] "For example, if the defendant was convicted under 18 U.S.C. § 2155 of throwing paint on defense equipment or supplies as an act of protest during peacetime, the offense level in subsection (a)(2) [twenty-six, as currently mandated under § 2M2.3,] may overrepresent the seriousness of the offense."). *Id*. Although the proposed amendment was not accepted by Congress, it also was not rejected and instead was categorized as a "non-emergency" amendment likely due to the very few cases that are ever charged under the statute, as the Sentencing Commission acknowledged. *See* 62 Fed. Reg. at 152, 160 (describing the amendment amongst many others as "non-emergency") and *see also id*. at 196 (stating as one of its reasons to consolidate § 2M2.3 into §2B1.1, Theft, Embezzlement, Receipt of Stolen Property, and Property Destruction, because prosecutions under these statutes are infrequent. In [Fiscal Year] 1990 through 1995, there were no cases sentenced under these guidelines.").

As discussed above, the legislative history makes clear that Congress intended § 2155(a) to apply to those individuals intending to cause serious damage or intentionally hinder this country's national defense system during a time of war or when preparing for war. Peaceful protesters were not the targeted group behind the legislation, not even those such as defendants in this case who cut inoperable fences and then sat peacefully praying and singing on a nuclear weapons establishment. Such actions are not the same as those committed by defendants in *United States v. Melville* when they placed bombs

8

on National Guard trucks in order to disable the trucks. *See Melville*, 309 F. Supp. 774, 799 (1970).

This Court has the discretion and authority to treat this case like *Sicken* and *Platte* and find that defendants' conduct is atypical of the offenses Congress intended § 2155(a) to punish. A downward departure or variance is appropriate in this case because it is atypical and this Court does not have to wait for Congress to say so when the Sentencing Commission and other courts already have.

### III. Michael, Greg, and Sister Megan clearly are extraordinary

In the Court's last question, Hon. Judge Thapar asks on what basis should the Court find defendants' acts as extraordinary. Rec. Doc. 299, p. 10. Should they be compared to a wealthy businessman who gives away some of his wealth to charity? Or should they be compared to each other and similarly situated peace protesters? As Professor Berman has pointed out and in light of the diverse approaches sentencing courts have taken in response to this question, *Koon's* essential point about district court's departure decision-making is that any departure must reflect a "refined assessment" of "fact-specific circumstances" and not, as this Court has suggested, to compare these defendants to another class of defendants or subset of Americans. *See* Friend of Court Brief, at 7, n. 3.

The Sentencing Commission discourages courts from considering a number of factors when determining a downward departure, such as family ties and responsibilities at sentencing. *See* U.S.S.G. § 5H1.6. *See also* U.S.S.G. § 5H1.11, which provides that "[c]ivic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."

However, after *Booker*, "the fact that a factor is discouraged or forbidden under the guidelines does not automatically make it irrelevant when a court is weighing statutory factors apart from the guidelines." *United States v. Aitoro*, 446 F.3d 246, 255 n.9 (1st Cir. 2006); s*ee also United States v. Davis*, 458 F.3d 491, 498 (6th Cir. 2006) (noting that "[i]n an appropriate case, a trial court… has a freer hand to account for" a factor disapproved of by the Sentencing Commission's policy statements.). The Supreme Court cautioned, however, in *Koon* that when a sentencing court departs downward on the basis of a discouraged factor, those circumstances must be "exceptional." *See Koon*, 518 U.S. 81, 96 (1996).

Courts have granted downward departures for a variety of reasons including: granting a downward departure based on finding that defendant's lengthy incarceration would harm her family due to her "irreplaceability" (*see United States v. Husein*, 478 F.3d 318, 8 (6th Cir. 2007)); for downward departure based on white collar defendant's record of civic involvement in his community (*see United States v. Crouse*, 145 F. 3d 786, 790 (1998));[11] and where sentencing court granted three level downward departure based on defendant's assistance, in time and money, to individuals and local organizations (*see United States v. Serafini*, 233 F.3d 758, 773 (3rd Cir. 2000)). These cases are also relevant to a sentencing court's consideration of variances in light of the § 3553(a) factors.

Although this Court cites *Crouse* as a reason not to depart based on exceptional charitable acts, which are really not exceptional for a wealthy businessman, Michael,

---

[11] It is interesting that this Court cites this case as an example of how downward departures based on charitable acts are not a permissible basis for departure when the United States Supreme Court remanded the case back to the Sixth Circuit with instructions to fully consider *Koon*'s pronouncement as to sentencing court's discretion. Crouse v. United States, 519 U.S. 801, 117 S. Ct. 39, 136 L.Ed. 2d 3 (1996).

Greg, and Sister Megan live in poverty, have committed their lives to doing work for others, and are in no way similar to wealthy defendants seeking leniency based on their donations to charity. Defendants themselves would not call themselves extraordinary. In fact, they would likely shudder at that suggestion. Therefore, defense counsel urges this Court on their behalf to see their life-works, their commitment to peace and justice, and their selfless actions for all as extraordinary and grant them downward departures or variances from the Sentencing Guideline.[12] The courts in *Platte*, *Sicken*, and two out of the three judges in *Kabat* in an addendum to their opinion all found that similarly situated defendants who committed acts of nonviolent peaceful protest were extraordinary, atypical defendants, and did not deserve lengthy prison sentences.[13] This Court has full discretion to treat these three defendants similarly.

## Conclusion

Michael, Greg, and Sister Megan are not the saboteurs, the spies, the bomb making terrorists, or the kind of offenders Congress anticipated when it created the Federal Sabotage Act first in 1918, applied it to peacetime in 1940 as the nation readied itself for war, and amended it again to make it harsher in 2001 as again this country prepared to fight back. Rather, they, like the dissenting Eighth Circuit judge in *Kabat* and the Judge in *United States v. LaForge* acknowledged, "committed the acts here complained of as a desperate plea to the American people and its Government to stop the

---

[12] Defendants do not insist that the Court analyze their exceptional good works under a departure framework rather than as a variance from the Guidelines in accordance with the sentencing factors outlined in § 3553(a).

[13] These two Eighth Circuit Court of Appeal judges also noted in their addendum that in a later missile protest case in the Western District of Missouri the prosecution had not charged those defendants who were similarly situated with sabotage. Additionally, the sentencing judge, Hon. Elmo B. Hunter in the companion case against Martin John Holladay reduced his sentence to time served (17 months) from the initial sentence of 8 years imprisonment. *See Kabat*, 797 F.2d at 602 (Addendum).

military madness which they sincerely believe will destroy us all, friend and enemy alike."[14]

Respectfully submitted,

s/ William P Quigley
William P. Quigley, admitted pro hac vice
Loyola University New Orleans
7214 St. Charles Avenue
New Orleans, LA 70118
Quigley77@gmail.com
504-710-3074


s/ Christopher Scott Irwin
Christopher Scott Irwin
BPR #025478
POB 20363
Knoxville, TN 37920
(865) 257-4029
christopherscottirwin@yahoo.com

Francis L. Lloyd, Jr.
LAW OFFICE OF FRANCIS L. LLOYD, JR.
9111 Cross Park Drive, Suite D-200
Knoxville, TN  37923
tel:  (865) 470-4077 fax: (865) 978-6504
E-Mail:  FLLloydJr@gmail.com

---

[14] *See* United States v. LaForge, Judgment, CR. 4-84-66 (Nov. 8, 1984) (Attachment 2).

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all the parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

                                          s/ William Quigley